Entered on Docket
April 17, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED
APR 13 2007
CLERK
United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re ) Case No. 04-55963 ASW
) 
ROGER P. PITKIN, ) Chapter 13
) 
Debtor. )
)

MEMORANDUM DECISION
SUSTAINING DEBTOR'S OBJECTION
TO CLAIM OF ROBIN SCHNEYER

Before the Court, in the above-captioned Chapter 13 case, is Roger P. Pitkin's ("Debtor") objection to the filed claim of Robin Schneyer ("Creditor"). This matter was briefed and an evidentiary hearing was conducted on January 16, 17, and 19, 2007. The matter has been submitted for decision.

At trial, Creditor called Jiaxin "Anthony" Chen, Debtor and himself as witnesses. Debtor called himself as witness. Debtor is represented by Gregory D. McDonald, Esq. Creditor is pro se.

At the start of the evidentiary hearing, the parties agreed that the only possible liability Debtor may have to Creditor is through alleged fraudulent acts of Debtor. Creditor waived any

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF ROBIN SCHNEYER

liability based on alter ego or breach of contract. The parties agreed that the Court would try the issue of Debtor's liability first and, if necessary, the question of damages.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.

STATEMENT OF FACTS

On September 23, 2004, Debtor filed a voluntary petition under Chapter 13 of the United States Bankruptcy Code. On February 3, 2005, Creditor filed a proof of claim against Debtor's estate ("Claim") asserting that Debtor owed him $721,993.73 based on a pre-petition state court action filed by Creditor on January 29, 2002 (the "Action"). The Action alleged breach of contract and fraud arising from Creditor's employment as the Director of Technology at MediaBop.com ("MediaBop"). On March 9, 2005, Debtor filed an *Objection to Claim; Notice of Opportunity for Hearing; Certificate of Service Claimant: Robin Schneyer*, objecting to the entirety of Creditor's Claim.

**A. Background**

Debtor holds a bachelor of arts degree in economics from the University of California at Berkeley. Debtor's college education was interrupted for four years while Debtor served in the U.S. Navy as a carrier pilot. Debtor completed all of the course work for a Master of Business Administration degree at Pepperdine University. However, Debtor did not complete his thesis, and did not receive that degree.

After Debtor's service in the Navy and his studies, Debtor worked in sales for Sylvania and Motorola corporations during the late 1960s and early 1970s. Debtor worked with Motorola for approximately seven years. Debtor sold semi-conductors at Motorola and did not work in the technical side of business. Debtor later worked in sales at Signetics, which was later acquired by Phillips. Debtor met Jing Lu "Jimmy" Gu ("Gu") in the late 1980s. Debtor and Gu started a vending machine business in 1991 that was intended to evolve into other technical products. That business shut down in 1992 and Debtor and Gu worked separately.

In late 1997, Debtor started working at Gu's company, Vostech Corporation ("Vostech"). Gu was the sole shareholder of Vostech. Gu started Vostech several years prior to Debtor joining it. Debtor testified that Vostech was very successful in the consumer industry. Vostech had developed a sports talking card where consumers would place a photo of a sports figure on a card and press a button and the sports figure would talk to the consumer. Vostech sold this product to large retailers all over the country. Debtor was the vice president and chief operating officer of Vostech. Debtor's primary responsibility was sales and administrative functions at Vostech. Debtor had no involvement in the financial side of Vostech.

Creditor graduated from the University of Michigan with a bachelor of arts degree in mathematics. Creditor worked for Lockheed and attended evening courses at Lockheed to become a computer programmer. While at Lockheed, Creditor spent six years in intensive training as a software engineer and taught the same training courses for two years.

Creditor first met Gu in 1990 or 1991. Gu and Creditor developed a quasi-business relationship based on writing two patents together. Creditor had a scheme to develop a telephone answering system that Creditor wanted to develop into a patent, but Creditor is a software engineer and needed a hardware engineer. Gu is a hardware engineer and Creditor and Gu developed the machine in 1994 or 1995. The machine was not marketed. The second patent involved a self-correcting clock that was patented around 1997, although no product was produced. Creditor testified that Creditor believed that Creditor and Gu were friends. Creditor saw Gu socially on about five occasions during this time period.

**B. MediaBop**

In November 1999, Gu offered Creditor employment at Gu's newly formed corporation, MediaBop, but Creditor declined. MediaBop was a subsidiary of Vostech and Vostech and MediaBop shared the same offices. Creditor turned Gu's offer down in part because Creditor was pursuing making a movie at the time.

In mid-May 2000, Gu renewed his efforts to recruit Creditor to work for MediaBop. Gu invited Creditor to MediaBop's offices. Creditor testified that Creditor and Gu met three or four times in the last two weeks of May 2000. Creditor testified that at one of these meetings, either Gu or Debtor provided Creditor with a copy of MediaBop's business plan ("Business Plan"). Debtor was employed by MediaBop as vice president at the time. Part of Debtor's responsibilities at MediaBop were to provide strategic planning and to position MediaBop for an independent public offering. Debtor was also involved in marketing for MediaBop and managed the MediaBop sales personnel.

### 1. The Business Plan

The Business Plan was a collaboration between Gu and Debtor. Gu and Debtor met several times to develop the Business Plan. Gu provided Debtor with information in several meetings about how MediaBop's products were being developed and how they were going to be developed in the future and the marketing potential. Gu provided the facts and told Debtor how the specific products should be described and edited, what pictures should be in color, where the charts should go, and how the potential business prospects would be listed. Debtor drafted the English text. Both Debtor and Creditor testified that Gu's first language is Chinese and Gu had difficulty writing and speaking English.

Debtor believed that Gu had a genius in both technical and marketing knowledge. Debtor testified that the ideas for MediaBop's products were entirely Gu's. Gu had a technical background and had successfully developed new products in China. In Debtor's opinion, Gu was a top creator of technical products -- that was one of the reasons Debtor was with Vostech and MediaBop. Debtor had confidence in what Gu saw for the future of MediaBop. Gu explained logically to Debtor how Gu saw the internet and the internet explosion that was about to happen. Debtor believed that Gu correctly viewed the internet trends and could anticipate the kind of products that were beneficial to the consumers.

Debtor believed that the Business Plan was a very strong representation of the possibilities and products of MediaBop. Debtor really believed in MediaBop. The Business Plan discussed certain transfers of technology from Vostech to MediaBop. Debtor believed that if Gu said that certain transfers of technology or

money would take place from Vostech to MediaBop, those transfers would take place, since Gu completely controlled Vostech.

Gu went over every last detail of the Business Plan after Debtor completed it and Gu was extremely diligent about looking at all aspects of the Business Plan. Debtor testified that Debtor believed that MediaBop had a reasonable prospect of attaining the goals set forth in the Business Plan. Debtor had known Gu for some time and Debtor knew how good Gu was at developing new products. Debtor knew Gu had patents. Debtor saw the success of Vostech and the income that Gu told Debtor Vostech had generated and Debtor believed that MediaBop would expand that horizon. Debtor testified credibly that Debtor did not intentionally place any erroneous information in the Business Plan.

**2. Creditor's Employment at MediaBop**

Creditor testified that Gu, Creditor and Debtor were present for most of the meetings where Creditor's future employment at MediaBop was discussed. Creditor testified that there was a great deal of discussion about what the future would be for MediaBop and the discussion often included millions of dollars to be transferred from parent Vostech to the new company MediaBop -- and millions, if not billions, in expected revenue for MediaBop. Creditor also testified that one reason Creditor agreed to work at MediaBop was that Creditor found the MediaBop product ideas interesting and Creditor likes to work on such projects. Creditor also testified that Creditor thought that Gu was a hyper-optimist and exaggerated all of the time -- that was Gu's way and Creditor knew that.

Debtor testified that Debtor had one meeting with Creditor before Creditor joined MediaBop. Debtor specifically recalls a

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF ROBIN SCHNEYER       6

meeting that took place in Gu's office because Gu asked Debtor to come into the office and tell Creditor what Debtor thought of MediaBop and its prospects. Debtor told Creditor that Debtor believed that MediaBop's prospects were terrific, that the internet was really a timely situation and that MediaBop was going to be a really good company. Debtor did not sit and negotiate any terms of Creditor's contract. Debtor testified that Debtor came into the room for a period of time and then left. Debtor did not make any promises to Creditor to try to induce Creditor to work at MediaBop.

Gu offered Creditor many incentives to have Creditor join MediaBop. Creditor testified that on May 28, 2000, at a meeting with Gu, Creditor and Debtor held in Debtor's office at MediaBop, Creditor dictated the terms of Creditor's employment contract. Creditor agreed to become MediaBop's Director of Technology for a salary of $10,000 per month plus 50,000 shares of MediaBop stock. Creditor explained that Gu personally promised to buy the 50,000 shares of MediaBop stock back from Creditor for $100,000 after eighteen months if Creditor provided eighteen months of continuous service at MediaBop. Creditor testified that Creditor was trying to accumulate funds to make a movie. The $100,000 buy-back guarantee was approximately the amount of funds Creditor needed to make his movie. Creditor nearly had the amount prior to working for MediaBop, but those funds were lost in the stock market downturn. Creditor was concerned about the risks of working for a start-up from past experience and that is one of the reasons Creditor demanded the guaranteed buy-back. Creditor was not going to risk any investment of time in MediaBop. Creditor believed that Gu had the means to pay the $100,000 buy-back guarantee because

Creditor believed that Gu was wealthy. Creditor intended the buy-back to be solely Gu's responsibility.

Creditor testified that he asked that the terms of the oral agreement be written down so the parties could sign it. Creditor testified that Debtor told Creditor that the lawyer was busy with start up activities and Creditor would have to wait for the contract to be written down.

Creditor started work at MediaBop on June 1, 2000. Both Debtor and Creditor testified that Gu directed the engineers. Creditor testified that Gu directed the engineers in their projects and Creditor did not know when engineers were hired or fired. Most of the communication between Gu and the engineers was conducted in Chinese. Creditor testified that he does not speak Chinese and the engineers spoke limited English at best. Creditor testified that Gu's management style was to have control over the engineers. Debtor testified that Gu's management style was that Gu wanted to run everything himself. Gu wanted to be in on all of the decisions and wanted to make sure that things were going the way Gu wanted them to go. Gu was a hard-charging, high-ego type of executive. Gu made the decisions about the products and the process for MediaBop and entirely ran all of the technical aspects of MediaBop.

### 3. The Promissory Note

Around October 4, 2000, Creditor completed the first demonstration version of a video sampling device and was awarded an additional 20,000 shares of options for MediaBop stock. Creditor asked that 10,000 of his option shares be distributed among five of the engineers working for Creditor. Creditor testified that Creditor gave a list of the engineers and amounts of shares to be

distributed to Debtor and assumed that Debtor took all steps necessary to provide for that distribution.

Creditor also testified that this is when Creditor first discovered that Gu interpreted the original 50,000 shares as options, not stock. Creditor testified that a shouting match ensued between Gu and Creditor at which time Creditor accepted that the original 50,000 stock shares were stock options. Creditor insisted that the promise be written down or Creditor would resign immediately. Debtor testified that Gu delegated to Debtor the task of drafting the agreement for the purchase of the stock between Gu and Creditor. On October 4, 2000, Debtor showed Creditor a document entitled "promissary note" [sic] ("Note") that Debtor prepared without any legal help. The Note states:

> MediaBop has issued a stock option effective 6/1/00 to Robin Schneyer for 50,000 shares of MediaBop common stock. MediaBop will guarantee to repurchase the rights to these 50,000 shares for a net amount of $100,000 from the stock to be paid to Robin Schneyer on 11/30/01, at his option. MediaBop has also issued an additional option for 10,000 shares to Robin Schneyer not as a part of this promissary [sic] note.

Debtor handwrote the last sentence and made other handwritten revisions to that sentence. Debtor signed the Note on behalf of MediaBop. Creditor initialed the handwritten changes

In January 2001, Debtor asked Creditor if MediaBop could defer Creditor's monthly salary for February. Creditor agreed and received no salary in February 2001. Half of Creditor's deferred salary was paid on August 1, 2001, and the rest was paid after Creditor resigned.

In mid-February 2001, Creditor approached Debtor about a written employment contract since Creditor remembered he had not

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF ROBIN SCHNEYER            9

seen one. Creditor testified that Debtor promised to prod the lawyer again about the employment agreement. Creditor accepted Debtor's statement, however Creditor testified that Creditor was worried because there was no written employment agreement.

Creditor noticed that MediaBop was getting smaller and Creditor was having difficulty getting along with Gu as Creditor's boss. In April 2001, Creditor announced that he was leaving MediaBop, even though to do so meant giving up the buy-back guarantee. Creditor believed that Creditor could make sufficient money consulting to make up for the loss. Creditor had a discussion with Gu that day. Creditor testified that Gu said that Creditor could take his stock options with him anyway and Gu seemed friendly again. Gu asked Creditor to stay until the end of April and work on another project. Creditor found working on the new project so much fun that Creditor stayed beyond the end of April.

Creditor testified that around September 1, 2001, while Gu was in China, another MediaBop engineer related something to Creditor that caused Creditor to worry that Gu may not honor the buy-back guarantee. Creditor went to Debtor and asked for a copy of the Note signed in October 2000. In reviewing the Note, Creditor told Debtor that the buy-back guarantee was incorrectly written because Gu personally guaranteed the repurchase of the shares, not MediaBop. Creditor testified that Debtor replied, "It doesn't make any difference. They are the same thing. Jimmy and I won't let this company die."

Around September 7, 2001, Debtor told Creditor that due to economic conditions, Creditor's salary was going to be reduced to $100,000 per year, in line with the reduction in salary of other

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF ROBIN SCHNEYER           10

top managers.  Creditor asked if this was a deferment or reduction
and was told it was a reduction.  Debtor testified that Creditor
became upset and said he wanted to resign.  Creditor testified that
Creditor sought legal advice on September 19, 2001, and wrote a
novation ("Novation") setting forth the terms of his previously
oral employment agreement.  The Novation incorporated a reduction
of Creditor's monthly salary to $8,000.  Creditor believed that
MediaBop's request to reduce Creditor's salary was a breach of the
original oral employment agreement and the Novation was a brand new
agreement.

### 4. Creditor's Resignation

Gu returned from China and, on September 21, 2001, Creditor
went to see Gu.  At first Gu refused to see Creditor.  Creditor
gave the Novation -- signed by Creditor -- to Debtor to deliver to
Gu.  Debtor delivered the Novation to Gu and then Gu and Creditor
had a discussion in Gu's office.  Creditor testified that Gu did
not deny the validity of the prior oral agreement.  Gu requested
that the $100,000 buy-back guarantee be apportioned in monthly
installments over a year.  Creditor accepted that revision.  Gu
then requested that Creditor increase Creditor's employment
guarantee by a year, which Creditor refused to do.  Creditor
countered with an offer to stay until March 2002.  Gu refused to
sign the Novation and made it clear to Creditor that Creditor would
not be paid on the $100,000 buy-back guarantee.  Creditor resigned
his employment immediately.

Creditor testified that he left Gu's office angry and
depressed.  Creditor collected his things from his desk and stopped
by Debtor's office to find out when Creditor would receive his

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF ROBIN SCHNEYER                11

final checks. In a brief meeting, Debtor told Creditor that there was also a stock option agreement for Creditor and Debtor would try to get that agreement for Creditor if Creditor wanted it. Creditor said yes. Creditor testified that there was no other conversation at that meeting except perhaps goodbyes. Creditor testified that Debtor said nothing whatsoever about the Note or Creditor staying on for two more months or any such thing.

Debtor testified that Debtor's September 21, 2001 meeting with Creditor took place in Debtor's office. Debtor sat at his desk and Creditor sat in the chair next to the desk. Debtor distinctly recalls the meeting because Gu asked Debtor to try to get Creditor to stay with MediaBop. Debtor believed that Creditor was a key part of the technical expertise of MediaBop. Debtor testified that at the meeting, Debtor told Creditor that Debtor wanted Creditor to stay. Creditor stated that one reason Creditor was leaving was the salary reduction and Creditor would not stand for it. Debtor told Creditor that the salaries of all of the managers were being reduced by the same percentage. Debtor testified that Debtor specifically told Creditor that if Creditor resigned, Creditor would not receive the benefits of the buy-back guarantee. Creditor said that he did not care because Creditor could get a job anywhere for more money.

Debtor testified that he prepared a memo reflecting what transpired at the exit interview a couple of days after the interview took place ("Exit Memo"). Creditor disputes that the Exit Memo accurately reflects what transpired at the exit interview. Creditor testified that with the possible exception of

the first sentence that Creditor would get another job, nothing in the Exit Memo is accurate.

Creditor testified that one week later, around October 2, 2001, Creditor returned to MediaBop to pick up his last check and sign the stock option agreement, but learned there was no such agreement. The only document signed by both parties relating to Creditor's employment at MediaBop was the Note.

### 5. Creditor's Collection Action

Creditor noticed that the Note did not reflect the eighteen month work requirement and decided to write an invoice for payment on the Note. On November 29, 2001, Creditor hand-delivered to MediaBop an invoice for the $100,000 repurchase of the 50,000 option shares. MediaBop did not respond to the invoice.

On January 29, 2002, Creditor sued Gu, Debtor, Vostech and MediaBop jointly for breach of contract and fraud. All defendants were defaulted pre-petition in the Action and all answers were stricken for discovery abuse.[1] Debtor's bankruptcy case was filed on the eve of Creditor's prove-up hearing required by the state court before it would impose a judgment by default.

Debtor testified that after Creditor left MediaBop, Debtor had to demonstrate MediaBop's product that Creditor had been working on, but the product would not work consistently. No employee of MediaBop at the time knew how Creditor had written the software. It took almost six months before the software was entirely debugged

---

[1] Debtor explained that there were no funds to employ counsel to defend MediaBop in the Action and thus, MediaBop could not appear in the Action. Debtor erroneously understood at the time that since MediaBop could not appear in the Action, Debtor also could not appear and Debtor did not defend himself in the Action.

Case: 04-55963    Doc# 71    Filed: 04/13/07    Entered: 04/17/07 16:27:16    Page 13 of 20

and the product was functional. Debtor testified that the delay in the release of the product meant that the window of potential customers closed and the product was not as successful as Debtor believed it could have been.

MediaBop stopped paying Debtor's salary in 2002. Debtor stayed an additional year with MediaBop without getting paid because Debtor believed that Debtor could save the company in some fashion, bring it back to a beginning level again and go forward. Gu went back to China to try and save MediaBop with new products and new investors. Eventually MediaBop shut down. Today Debtor sells high-end, all-season sunrooms.

II.

ANALYSIS

Pursuant to Bankruptcy Code § 502(a),[2] a proof of claim is deemed allowed unless a party in interest objects to it. Rule 3001(f) of the Federal Rule of Bankruptcy Procedure, provides that, "[a] proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). If there is an objection to a filed claim, the objecting party "is then called upon to produce evidence and show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves. But the ultimate burden of persuasion is always on the claimant." Wright v. Holm, 931 F.2d 620, 623 (9th Cir. 1991); In re Pugh, 157 B.R. 898, 901 (9th Cir. BAP 1993).

---

[2] Title 11, United States Code, as it existed when Debtor filed his bankruptcy case.

In this case, Creditor filed his Claim asserting that Debtor owed him $721,993.73 resulting from fraud in connection with Creditor's employment as the Director of Technology at MediaBop. Debtor objected to Creditor's Claim on the grounds that the claim is without merit and, <u>inter alia</u>, seeks to recover from Debtor as an individual for damages resulting from the alleged actions of a corporation.

Under California law, "[d]irectors and officers of a corporation are liable for torts committed by them on its behalf. . . . However, directors or officers do not incur personal liability for corporate torts merely because of their official position unless they *participate* in the wrong or *authorize or direct* that it be done." 5 Witkin, <u>Summary of California Law</u>, Torts § 33 (10th ed. 2005) (emphasis in original). Thus, for Creditor to have a claim against Debtor, Debtor must have participated in, or authorized, or directed some fraudulent act.

> It is well established in California and other jurisdictions that a person who has been induced by fraudulent misrepresentations to enter into a contract or to make a conveyance may have the contract or conveyance set aside and secure a restitution of those benefits lost to him by the transaction. A fraudulent misrepresentation is one made with the knowledge that it is or may be untrue, and with the intention that the person to whom it is made act in reliance thereon. It must appear, however, not only that the plaintiff acted in reliance on the misrepresentation but that he was justified in his reliance. He may not justifiably rely upon mere statements of opinion, including legal conclusions drawn from a true statement of facts, unless the person expressing the opinion purports to have expert knowledge concerning the matter or occupies a position of confidence and trust.

<u>Seeger v. Odell</u>, 18 Cal. 2d 409, 414 (1941) (citations omitted). Creditor asserts Debtor committed fraud towards Creditor through alleged misrepresentations made in the Business Plan, the Note and

Debtor's representations that there would be a written employment agreement. Debtor asserts there was no fraud. This Court agrees with Debtor. Creditor has not meet his burden of proving by a preponderance of the evidence that Debtor made any misrepresentation with knowledge that the misrepresentation was untrue and with the intent that Creditor rely on the misrepresentation and that Creditor in fact justifiably relied on the misrepresentation to Creditor's detriment.

### A. The Business Plan

Creditor first asserts that Debtor is liable to Creditor for alleged misrepresentations made in the Business Plan. Creditor has failed to meet his burden of proof. First, the evidence shows that the Business Plan was a collaborative effort on the part of Gu and Debtor and that Gu dictated the contents of the Business Plan, and Debtor essentially drafted the text -- all the information in the Business Plan was placed in it at the instruction of Gu. Even if there was some misrepresentation, Debtor credibly testified that he did not intentionally place any erroneous information in the Business Plan. Debtor also testified and Creditor did not dispute that Gu thoroughly reviewed the Business Plan after Debtor finished with the final draft and Gu made additional corrections. Debtor also testified credibly that Debtor believed that the Business Plan accurately reflected the business prospects for MediaBop.

Alternatively, even if Creditor had demonstrated that Debtor knew there were misrepresentations in the Business Plan, the evidence does not support a finding that Creditor justifiably relied on the Business Plan in accepting his employment at MediaBop. Creditor testified that Creditor knew Gu was a hyper-

optimist and that Gu exaggerated extensively. Creditor was so concerned with working for a start-up company that Creditor negotiated a guaranteed repurchase of his stock shares upon Creditor completing eighteen months of continuous employment. The evidence supports a finding that Creditor was wary of start-ups and knew that Gu could be overly optimistic in his presentation of facts. Creditor did not justifiably rely on the Business Plan in accepting employment at MediaBop.

**B.  The Note**

Creditor next asserts that Debtor is liable to Creditor for Debtor's execution of the Note. Again Creditor has failed to meet his burden of proof. First, in order for Creditor to prevail, Creditor would need to show that when Debtor executed the Note on behalf of MediaBop and at Gu's request, that Debtor knew in October 2000 that Gu did not intend to honor the Note. The evidence is to the contrary. Debtor had no reason to believe that Gu would not honor the Note. Creditor himself testified that when Creditor told Gu that Creditor was going to resign April 2001, Gu proposed to honor the buy-back guarantee even though Creditor had not worked the full eighteen months as originally agreed. Thus, Gu apparently intended to honor the Note in April 2001. Creditor also testified that when Creditor had his meeting with Gu on September 21, 2001, Gu initially agreed to honor the oral employment agreement and Gu and Creditor negotiated some amendments to that agreement. Thus, Gu intended to honor the Note in September 2001. There is no evidence that Gu intended not to honor the Note when Debtor presented it to Creditor in October 2000, and there is no evidence that Debtor fraudulently misrepresented the Note.

## C. Representations Regarding a Written Employment Agreement

Finally, Creditor asserts Debtor committed fraud when Debtor represented to Creditor on several occasions that the oral employment agreement would be reduced to writing. Again, in order for Creditor to prevail, Creditor would need to show that when Debtor made the different statements regarding the status of a written employment contract that Debtor knew that those statements were false and intended for Creditor to rely on the statements. There is nothing in the record to indicate that Debtor knew any such statements were false when the alleged statements were made to Creditor. Moreover, the evidence shows that Gu intended to honor Creditor's employment contract terms even without a written agreement in April 2001 and September 2001. There is no evidence that Debtor fraudulently misrepresented the status of the written employment contract to Creditor.

Finally, the Court notes that under any of the above scenarios, in order to prove fraud, Creditor must show damages that resulted from any misrepresentation that Debtor gave that Debtor knew was false at the time Debtor gave it, on which Creditor justifiably relied. Creditor bases his damages claim on the failure of Gu to pay the $100,000 buy-back guarantee. However, Creditor testified that the $100,000 buy-back guarantee was based on Creditor providing eighteen months of continuous service at MediaBop and Creditor resigned after only sixteen months of employment. Thus, Creditor was not entitled to the $100,000 buy-back guarantee under the terms of Creditor's employment contract with MediaBop, so Creditor did not suffer any damages.

## III.

### CONCLUSION

For the reasons stated above Debtor's objection to Creditor's Claim is sustained and such Claim is disallowed in its entirety.

Counsel for Debtor shall submit a form of order so providing, after review by Creditor as to form.

Dated: April 13, 2007

*Arthur S. Weissbrodt*
ARTHUR S. WEISSBRODT
UNITED STATES BANKRUPTCY JUDGE

Court Service List

Roger P. Pitkin
1281 Shanghai Ct.
San Jose, CA 95131

Gregory D. McDonald, Esq.
Law Offices of Gregory D. McDonald
Old Bank of America Bldg.
12 S 1st St. #417
San Jose, CA 95113

Robin Schneyer
3470 Brookdale Drive
Santa Clara, CA 95051

Devin Derham-Burk
P.O. Box 50013
San Jose, CA 95150-0013

U.S. Trustee
Office of the U.S. Trustee
U.S. Federal Bldg.
280 S 1st St. #268
San Jose, CA 95113-3004